IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| v. | : Case No. 23-cr-61 (ABJ) |
| JOHN O'KELLY, | : |
| Defendant. | : |

**UNITED STATES' OPPOSITION TO DEFENDANT O'KELLY'S
MOTION FOR TRANSFER OF VENUE**

The United States respectfully submits this opposition to defendant John O'Kelly's Motion for Transfer of Venue, ECF No. 33. O'Kelly contends that venue should be transferred to the Eastern District of New York because of (1) the size and characteristics of the jury pool in the District of Columbia, (2) the type of information included in media coverage concerning O'Kelly's case, and (3) the time between O'Kelly's arrest and his scheduled trial this summer. *See* ECF No. 33 at 1–2. He makes the same arguments that this Court has heard and rejected in *United States v. Williams*, No. 21-cr-618 (ABJ), ECF No. 63 (Aug. 12, 2022), and *United States v. Garcia*, No. 21-cr-129 (ABJ), 2022 WL 2904352 (D.D.C. July 22, 2022). O'Kelly fails to establish that he "cannot obtain a fair and impartial trial" in this district, Fed. R. Crim. P. 21(a), and this Court should deny his motion.[1]

---

[1] Judges on this Court have denied motions for change of venue in dozens of January 6 prosecutions, and no judge has granted a change of venue in a January 6 case. *See, e.g., United States v. Ballenger*, 640 F. Supp. 3d 34 (D.D.C. 2022) (JEB); *United States v. Nassif*, 628 F. Supp. 3d 169, 185–88 (D.D.C. 2022) (JDB); *United States v. Ramey*, 22-cr-184, Minute Entry (D.D.C. Jan. 30, 2023) (DLF); *United States v. Eckerman, et al.*, No. 21-cr-623, Minute Order (D.D.C. Jan. 26, 2023) (CRC); *United States v. Pollock, et al.*, No. 21-cr-447, Minute Entry (D.D.C. Jan. 25,

## BACKGROUND

### I. Factual Background

The relevant factual background for this case is put forth in the government's response to O'Kelly's motion to dismiss, ECF No. 31, which was filed simultaneously with this opposition.

---

2023) (CJN); *United States v. Gossjankowski*, No. 21-cr-0123, 2023 WL 395985 (D.D.C. Jan. 25, 2023) (PLF); *United States v. Adams*, No. 21-cr-212, ECF No. 60 (D.D.C. Jan. 24, 2023) (ABJ); *United States v. Rhine*, No. 21-cr-0687, 2023 WL 372044 (D.D.C. Jan. 24, 2023) (RC); *United States v. Oliveras*, No. 21-cr-738, 2023 WL 196679 (D.D.C. Jan. 17, 2023) (BAH); *United States v. Sheppard*, No. 21-cr-203, 2022 WL 17978837 (D.D.C. Dec. 28, 2022) (JDB); *United States v. Samsel, et al.*, No. 21-cr-537, ECF No. 227 (D.D.C. Dec. 14, 2022) (JMC); *United States v. Gillespie,* No. 22-cr-60, ECF No. 41 (D.D.C. Nov. 29, 2022) (BAH); *United States v. Barnett*, No. 21-cr-38, ECF No. 90 (D.D.C. Nov. 23, 2022) (CRC); *United States v. Bender, et al.*, No. 21-cr-508, ECF No. 78 (D.D.C. Nov. 22, 2022) (BAH); *United States v. Sandoval*, No. 21-cr-195, ECF No. 88 (D.D.C. Nov. 18, 2022) (TFH); *United States v. Vargas Santos*, No. 21-cr-47, Minute Entry (D.D.C. Nov. 16, 2022) (RDM); *United States v. Nordean, et al.*, No. 21-cr-175, ECF No. 531 (D.D.C. Nov. 9, 2022) (TJK); *United States v. Eicher*, No. 22-cr-38, 2022 WL 11737926 (D.D.C. Oct. 20, 2022) (CKK); *United States v. Schwartz, et al.*, No. 21-cr-178, ECF No. 142 (D.D.C. Oct. 11, 2022) (APM); *United States v. Brock*, No628 F. Supp. 3d 85 (D.D.C. 2022) (JDB), aff'd, No. 23-3045, 2023 WL 3671002 (D.C. Cir. May 25, 2023); *United States v. Jensen*, No. 21-cr-6, Minute Entry (D.D.C. Aug. 26, 2022) (TJK); *United States v. Seitz*, No. 21-cr-279, Minute Order (D.D.C. Aug. 17, 2022) (DLF); *United States v. Strand*, No. 21-cr-85, ECF No. 89 (D.D.C. Aug. 17, 2022) (CRC); *United States v. Williams*, No. 21-cr-618, ECF No. 63 (D.D.C. Aug. 12, 2022) (ABJ); *United States v. Herrera*, No. 21-cr-619, ECF No. 54 (D.D.C. August 4, 2022) (BAH); *United States v. Garcia*, No. 21-cr-129, 2022 WL 2904352 (D.D.C. July 22, 2022) (ABJ); *United States v. Rusyn, et al.*, No. 21-cr-303, Minute Entry (D.D.C. July 21, 2022) (ABJ); *United States v. Bledsoe*, No. 21-cr-204, Minute Order (D.D.C. July 15, 2022) (BAH); *United States v. Calhoun*, No. 21-cr-116, Minute Order (D.D.C. July 11, 2022) (DLF); *United States v. Rhodes, et al.*, 610 F. Supp. 3d 29 (D.D.C. 2022) (APM); *United States v. Williams*, No. 21-cr-377, Minute Entry (D.D.C. June 10, 2022) (BAH); *United States v. McHugh*, No. 21-cr-453, Minute Entry (D.D.C. May 4, 2022) (JDB); *United States v. Hale-Cusanelli*, No. 21-cr-37, Minute Entry (D.D.C. April 29, 2022) (TNM); *United States v. Webster*, No. 21-cr-208, ECF No. 78 (D.D.C. Apr. 18, 2022) (APM); *United States v. Alford*, 21-cr-263, ECF No. 46 (D.D.C. Apr. 18, 2022) (TSC); *United States v. Brooks*, No. 21-cr-503, ECF No. 31 (D.D.C. Jan. 24, 2022) (RCL); *United States v. Bochene*, 579 F. Supp. 3d 177 (D.D.C. 2022) (RDM); *United States v. Fitzsimons*, No. 21-cr-158, Minute Order (D.D.C. Dec. 14, 2021) (RC); *United States v. Reffitt*, No. 21-cr-32, Minute Order (D.D.C. Oct. 15, 2021) (DLF); *United States v. Caldwell*, No. 21-cr-28, ECF No. 415 (D.D.C. Sept. 14, 2021) (APM).

## II. Procedural Background

On March 1, 2023, a grand jury returned the Indictment in this case, charging O'Kelly with: (1) civil disorder, in violation of 18 U.S.C. § 231(a)(3) (Count One); (2) assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a)(1) (Count Two); (3) entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Three); (4) disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Four); (5) engaging in physical violence in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(4) (Count Five); and (6) committing an act of physical violence in the Capitol grounds or buildings, in violation of 40 U.S.C. § 5104(e)(2)(F) (Count 6).

A trial is scheduled to begin in this case on June 17, 2024.

On January 15, 2024, O'Kelly filed his motion to transfer venue.

## LEGAL STANDARD

The Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed." U.S. Const. Art. III, § 2, cl. 3. The Sixth Amendment similarly guarantees the right to be tried "by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI. These provisions provide "a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." *United States v. Cores*, 356 U.S. 405, 407 (1958). Transfer to another venue is constitutionally required only where "extraordinary local prejudice will prevent a fair trial." *Skilling v. United States*, 561 U.S. 358, 378 (2010); *see* Fed. R. Crim. P. 21(a) (requiring transfer to another district if "so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there").

3

The primary safeguard of the right to an impartial jury is "an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (italics omitted). Thus, the best course when faced with a pretrial publicity claim is ordinarily "to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity." *United States v. Campa*, 459 F.3d 1121, 1146 (11th Cir. 2006) (en banc). "[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire." *United States v. Haldeman*, 559 F.2d 31, 63 (D.C. Cir. 1976) (en banc) (per curiam). And, after voir dire, "it may be found that, despite earlier prognostications, removal of the trial is unnecessary." *Jones v. Gasch*, 404 F.2d 1231, 1238 (D.C. Cir. 1967).

## ARGUMENT

O'Kelly's motion parrots a well-trod argument that, despite sporting a population of 700,000, a change of venue is warranted because a portion of D.C. residents has been either affected by the events of January 6, 2021, or exposed to prejudicial media reporting—and not enough time has passed to diminish any of these prejudicial effects. As has been repeatedly recognized, none of these arguments has merit.

"The mere existence of intense pretrial publicity is not enough to make a trial unfair, nor is the fact that potential jurors have been exposed to this publicity." *United States v. Childress*, 58 F.3d 693, 706 (D.C. Cir. 1995); *see Murphy v. Florida*, 421 U.S. 794, 799 (1975) (juror exposure to "news accounts of the crime with which [a defendant] is charged" does not "alone presumptively deprive[] the defendant of due process"). Indeed, "every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who

4

has not some impression or some opinion in respect to its merits." *Reynolds v. United States*, 98 U.S. 145, 155-56 (1878). Thus, the "mere existence of any preconceived notion as to the guilt or innocence of an accused, without more," is insufficient to establish prejudice. *Irvin*, 366 U.S. at 723. "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.*

The Supreme Court has recognized only a narrow category of cases in which prejudice is presumed to exist without regard to prospective jurors' answers during voir dire. *See Rideau v. Louisiana*, 373 U.S. 723 (1963). In *Rideau*, the defendant's confession—obtained while he was in jail and without an attorney present—was broadcast three times shortly before trial on a local television station to audiences ranging from 24,000 to 53,000 individuals in a parish of approximately 150,000 people. *Id.* at 724 (majority opinion), 728-29 (Clark, J., dissenting). The Court concluded that, "to the tens of thousands of people who saw and heard it," the televised confession "in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder." *Rideau*, 373 U.S. at 726. Thus, the Court "d[id] not hesitate to hold, without pausing to examine a particularized transcript of the voir dire," that these "kangaroo court proceedings" violated due process. *Id.* at 726-27.

Since *Rideau*, the Supreme Court has emphasized that a "presumption of prejudice . . . attends only the extreme case," *Skilling*, 561 U.S. at 381, and the Court has repeatedly "held in other cases that trials have been fair in spite of widespread publicity," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976). In the half century since *Rideau*, the Supreme Court has never presumed prejudice based on pretrial publicity. *But see Estes v. Texas*, 381 U.S. 532 (1965) (presuming prejudice based on media interference with courtroom proceedings); *Sheppard v.*

5

*Maxwell*, 384 U.S. 333 (1966) (same). In fact, courts have declined to transfer venue in some of the most high-profile prosecutions in recent American history. *See In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (per curiam) (capital prosecution of Boston Marathon bomber); *Skilling*, 561 U.S. at 399 (fraud trial of CEO of Enron Corporation); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (trial of participant in 1993 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (per curiam) (unpublished) (terrorism prosecution for conspirator in September 11, 2001 attacks); *Haldeman*, 559 F.2d at 70 (Watergate prosecution of former Attorney General John Mitchell and other Nixon aides).

In *Skilling*, the Supreme Court considered several factors in determining that prejudice should not be presumed where former Enron executive Jeffrey Skilling was tried in Houston, where Enron was based. *Skilling*, 561 U.S. at 382-83. First, the Court considered the "size and characteristics of the community." *Id.* at 382. Unlike *Rideau*, where the murder "was committed in a parish of only 150,000 residents," Houston was home to more than 4.5 million people eligible for jury service. *Id.* at 382. Second, "although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Id.* Third, "over four years elapsed between Enron's bankruptcy and Skilling's trial," and "the decibel level of media attention diminished somewhat in the years following Enron's collapse." *Id.* at 383. "Finally, and of prime significance, Skilling's jury acquitted him of nine insider-trading counts," which undermined any "supposition of juror bias." *Id.*

Although these *Skilling* factors are not exhaustive, courts have found them useful when considering claims of presumptive prejudice based on pretrial publicity. *See, e.g.*, *In re Tsarnaev*,

6

780 F.3d at 21-22; *United States v. Petters*, 663 F.3d 375, 385 (8th Cir. 2011). And contrary to O'Kelly's contention, those factors do not support a presumption of prejudice in this case.

### I. The Size and Characteristics of the District of Columbia Do Not Support a Presumption of Prejudice

O'Kelly suggests, ECF No. 33 at 3, that an impartial jury cannot be found in D.C. despite the District's population of approximately 700,000. Although this District may be smaller than most other federal judicial districts, it has a larger population than two states (Wyoming and Vermont), and more than four times as many people as the parish in *Rideau*. The relevant question is not whether the District of Columbia is as populous as the Southern District of Texas in *Skilling*, but whether it is large enough that an impartial jury can be found. In *Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991), the Court cited a county population of 182,537 as supporting the view than an impartial jury could be selected. And *Skilling* approvingly cited a state case in which there was "a reduced likelihood of prejudice" because the "venire was drawn from a pool of over 600,000 individuals." *Skilling*, 561 U.S. at 382 (quoting *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1044 (1991)). There is simply no reason to believe that, out of an eligible jury pool of nearly half a million, "12 impartial individuals could not be empaneled." *Id.*

Likewise, the prevalence of federal employees in D.C., ECF No. 33 at 3–4, is not a characteristic that supports a change of venue. For one, O'Kelly fails to explain how merely being employed by the federal government would render a person incapable of serving as an impartial juror. Although some federal employees, such as the U.S. Capitol Police, were affected by the events of January 6, many others were neither directly nor indirectly impacted. Indeed, many federal employees were nowhere near the Capitol on January 6 given the maximum telework posture of many federal agencies at the time. And the storming of the Capitol on January 6 was

7

not aimed at the federal government in general, but specifically at Congress' certification of the electoral vote. There is therefore no reason to believe that federal employees with little or no connection to the events at the Capitol could not be impartial in this case. *See United States v. Bochene*, 579 F.Supp.3d 177, 181-182 (D.D.C. 2022) (January 6 defendant's claim that federal employees would "have a vested interest in supporting their employer" was "exactly the kind of conjecture that is insufficient to warrant transfer prior to jury selection"). Even assuming (incorrectly) that every federal employee is affected by improper bias, the Court could draw a jury from those District residents who are not employed by the federal government. According to the Office of Personnel Management, around 141,000 non-Postal Service employees worked in Washington, D.C., in 2017. OPM, Federal Civilian Employment, available at https://www.opm.gov/policy-data-oversight/data-analysis-documentation/federal-employment-reports/reports-publications/federal-civilian-employment/. But many federal employees who work in the District live outside the District and would not be part of the jury pool. And the District has nearly 700,000 residents. Thus, even if every federal employee were disqualified, the Court would be able to pick a jury in this District.

        D.C.'s political makeup also does not support a change of venue. The en banc D.C. Circuit rejected a nearly identical claim in *Haldeman*, where the dissent concluded that a venue change was required because "Washington, D.C. is unique in its overwhelming concentration of supporters of the Democratic Party" and the Democratic candidate received 81.8% and 78.1% of the vote when Nixon ran for President in 1968 and 1972, respectively. *Haldeman*, 559 F.2d at 160 (MacKinnon, J., concurring in part and dissenting in part). The majority rejected the relevance of this fact, observing that authority cited by the dissent gave no "intimation that a community's

voting patterns are at all pertinent to venue." *Id.* at 64 n.43; *see also United States v. Chapin*, 515 F.2d 1274, 1286 (D.C. Cir. 1975) (rejecting the argument that "because of [the defendant's] connection with the Nixon administration and his participation in a 'dirty tricks' campaign aimed at Democratic candidates and with racial overtones, a truly fair and impartial jury could not have been drawn from the District's heavily black, and overwhelmingly Democratic, population").

If "the District of Columbia's voting record in the past two presidential elections" is not "at all pertinent to venue" in a case involving high-ranking members of a presidential administration, *Haldeman*, 559 F.2d at 64 n.43, it cannot justify a change of venue here. To be sure, *some* potential jurors might be unable to be impartial in January 6 cases based on disagreement with the defendants' political aims. But whether individual prospective jurors have such disqualifying biases can be assessed during voir dire. This Court should not presume that every member of a particular political party is biased simply because this case has a political connection. Indeed, the Supreme Court has stated in the context of an election-fraud trial, that "[t]he law assumes that every citizen is equally interested in the enforcement of the statute enacted to guard the integrity of national elections, and that his political opinions or affiliations will not stand in the way of an honest discharge of his duty as a juror in cases arising under that statute." *Connors v. United States*, 158 U.S. 408, 414 (1895). The same is true here. The District's voting record does not establish that this Court will be unable to select "an unbiased jury capable of basing its verdict solely on the evidence introduced at trial." *Haldeman*, 559 F.2d at 70.

To the contrary, as the nation's capital and seat of the federal government, the District has been home to its fair share of trials in politically charged cases. High-profile individuals strongly associated with a particular party, such as Marion Barry, John Poindexter, Oliver North, Scooter

9

Libby, Roger Stone, and Steve Bannon have all been tried in the District. *See United States v. Barry*, 938 F.2d 1327 (D.C. Cir. 1991); *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991); *United States v. North*, 910 F.2d 843 (D.C. Cir. 1990) (per curiam); *United States v. Libby*, 498 F. Supp. 2d 1 (D.D.C. 2007); *United States v. Stone*, 613 F. Supp. 3d 1 (D.D.C. 2020) (ABJ); *United States v. Bannon*, No. 210-cr-670 (CJN). Indeed, the Court in *Stone* rejected the argument that jurors "could not possibly view [Roger Stone] independently from the President" because of his role in the presidential campaign or that "if you do not like Donald Trump, you must not like Roger Stone." 613 F.Supp.3d 1, 38 (D.D.C. 2020). Similarly here, the fact that most District residents voted against Donald Trump does not mean those residents could not impartially consider the evidence against those charged in connection with the events on January 6.

## II. The Nature of Pretrial Publicity Concerning O'Kelly's Case Does Not Support a Presumption of Prejudice.

Contrary to O'Kelly's assertions, ECF No. 33 at 9, this case does not involve a "confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Skilling*, 561 U.S. at 382. Even news stories that are "not kind," *Skilling*, 561 U.S. at 382, or are "hostile in tone and accusatory in content," *Haldeman*, 559 F.2d at 61, do not alone raise a presumption of prejudice. As in *Skilling* and *Haldeman*, the news coverage of O'Kelly is "neither as inherently prejudicial nor as unforgettable as the spectacle of Rideau's dramatically staged and broadcast confession." *Id.* Indeed, although any media characterizations of O'Kelly would be inadmissible, the photos and videos of O'Kelly that have been published in the media would be both admissible and highly relevant at trial. *Compare Sheppard*, 384 U.S. at 360 (noting that information reported by the media was "clearly inadmissible" and that "[t]he exclusion of such evidence in court is rendered meaningless when

10

news media make it available to the public"), *with Murray v. Schriro*, 882 F.3d 778, 805 (9th Cir. 2018) ("There was no inflammatory barrage of information that would be inadmissible at trial. Rather, the news reports focused on relaying mainly evidence presented at trial."); *Henderson v. Dugger*, 925 F.2d 1309, 1314 (11th Cir. 1991) ("[B]ecause we have found [the defendant's] confessions were admissible, the damage if any from the [pretrial] publicity is negligible.").

O'Kelly also contends, ECF No. 33 at 13, that the nationally televised hearings of the U.S. House of Representatives Select Committee to Investigate the January 6th Attack on the United States Capitol (Select Committee), the publication of the Select Committee's January 6th Report, and the release of a documentary film about the events of January 6 support a change of venue. But the associated media exposure was not limited to D.C. Instead, the hearings were carried on national networks across the country. The Select Committee's report is available to anyone located anywhere with an internet connection. Likewise, a documentary and reviews of a film are available to potential jurors regardless of their locality. In similar circumstances, the D.C. Circuit affirmed the denial of a change of venue where the defendants—who were high-ranking members of the Nixon administration—complained that they were prejudiced by news coverage of the Watergate-related hearings. *Haldeman*, 559 F.2d at 62-64 & nn.35, 43. The court of appeals observed that "a change of venue would have been of only doubtful value" where the "network news programs and legislative hearings" related to Watergate were "national in their reach." *Id.* at n.43.

Moreover, the viewers of the Select Committee's first hearing represent only about 6% of the total U.S. population. O'Kelly has not pointed to any evidence that D.C. residents were more likely to have watched that hearing than citizens in other parts of the country. And even if D.C. residents tuned in at a higher rate, it is still likely that a majority of D.C. residents did not watch

11

the hearings. Moreover, those hearings have focused on the events of January 6 as a whole, not on the actions of O'Kelly. There is no reason to believe that coverage of the hearings, the Select Committee releasing a report, or a documentary film being released and reviewed by a film critic will create in D.C. such a degree of bias against this particular defendant that an impartial jury cannot be selected.

Additionally, a careful voir dire—rather than a change of venue—is the appropriate way to address potential prejudice of this sort. "[*V*]*oir dire* has long been recognized as an effective method of routing out [publicity-based] bias, especially when conducted in a careful and thoroughgoing manner." *In re Nat'l Broadcasting Co.*, 653 F.2d 609, 617 (D.C. Cir. 1981). After a careful voir dire, this Court can select a jury from those residents who either did not watch the hearings or who, despite having watched the hearing, give adequate assurances of their impartiality. *See Haldeman*, 559 F.3d at 62 n.35 (rejecting claim of prejudice even though "several jurors" had "seen portions of the televised Senate hearings" related to Watergate).

Even "massive" news coverage of a crime does not require prejudice to be presumed. *Haldeman*, 559 F.2d at 61. And in contrast, a strikingly small percentage of the news coverage of January 6 has mentioned O'Kelly himself. A query of O'Kelly's name does return limited media coverage results; however, there appears to be no local media coverage of O'Kelly in D.C. Moreover, the limited reporting on O'Kelly seems clustered around the time of O'Kelly's arrest. Unlike most cases involving pretrial publicity, where the news coverage focuses on the responsibility of a single defendant (as in *Rideau* or *Tsarnaev*) or small number of co-defendants (as in *Skilling* and *Haldeman*), the events of January 6 involved thousands of participants and have so far resulted in charges against more than 900 people. The Court can guard against any spillover

12

prejudice from the broader coverage of January 6 by conducting a careful voir dire and properly instructing the jury about the need to determine a defendant's individual guilt.

And, in any event, any threat of such spillover prejudice is not limited to Washington, D.C. because much of the news coverage of January 6 has been national in scope. *See Haldeman*, 559 F.2d at 64 n.43 (observing that "a change of venue would have been of only doubtful value" where much of the news coverage was "national in [its] reach" and the crime was of national interest); *United States v. Bochene*, 579 F. Supp. 3d 177, 182 (D.D.C. 2022) ("The fact that there has been ongoing media coverage of the breach of the Capitol and subsequent prosecutions, both locally and nationally, means that the influence of that coverage would be present wherever the trial is held." (internal quotation marks omitted)). Indeed, the few news stories that mention O'Kelly are largely from sources with national circulation—and the few that appear to have local circulation are based in New York.[2] Sources with national circulation are also largely responsible for reporting the remarks from judges and other officials concerning the January 6 riot that O'Kelly references. *See* ECF No. 33 at 8, 1. Thus, the nature and extent of the pretrial publicity do not support a presumption of prejudice.

### III. The Passage of Time Before Trial Does Not Support a Presumption of Prejudice

In *Skilling*, the Court considered the fact that "over four years elapsed between Enron's bankruptcy and Skilling's trial." *Skilling*, 561 U.S. at 383. In this case, more than three entire years

---

[2] *See, e.g.*, Pei-Sze Cheng, "Long Island Attorney Arrested for Allegedly Fighting Police Officer During Jan. 6 Riot," Oct. 20, 2022, available at https://www.nbcnewyork.com/news/local/crime-and-courts/long-island-attorney-arrested-for-allegedly-fighting-police-officer-during-jan-6-riot/3916892/; Jacqueline Sweet, "LI Lawyer, Ex-School Board Member, Charged in Jan. 6 Riot: Feds," Oct. 21, 2022, available at https://patch.com/new-york/mineola/nassau-lawyer-arrested-assaulting-officers-during-capital-breach.

have already elapsed since the events of January 6, 2021, and a half-year more will have elapsed by the time of the currently-scheduled trial. Although January 6 continues to be in the news, the "decibel level of media attention [has] diminished somewhat," *Skilling*, 561 U.S. at 383. Moreover, only a relatively small percentage of the recent stories have mentioned O'Kelly himself, and much of the reporting has been national is scope, or limited to localities well outside this district, rather than limited to Washington, D.C. And, contrary to O'Kelly's assertion that the timing of other January 6-related litigation and the upcoming election will impact his case, these events would — if they have any effect at all—actually *decrease* attention specifically paid to O'Kelly.

### IV. The Lack of a Jury Verdict Supports a Lack of Prejudice.

Because O'Kelly has not yet gone to trial, the final *Skilling* factor—whether the "jury's verdict . . . undermine[s] in any way the supposition of juror bias," *Skilling*, 561 U.S. at 383—does not directly apply. But the fact that *Skilling* considered this factor to be "of prime significance," *id.*, underscores how unusual it is to presume prejudice before trial. Ordinarily, a case should proceed to trial in the district where the crime was committed, and courts can examine after trial whether the record supports a finding of actual or presumed prejudice. In short, none of the *Skilling* factors supports O'Kelly's contention that the Court should presume prejudice and order a transfer of venue without even conducting voir dire.

### V. The January 6-Related Trials That Have Already Occurred Demonstrate the Availability of s Significant Number of Fair, Impartial Jurors in the D.C. Venire.

At this point, dozens of January 6 cases have proceeded to jury trials, and the Court in each of those cases has been able to select a jury without undue expenditure of time or effort. *See Murphy*, 421 U.S. at 802-03 ("The length to which the trial court must go to select jurors who appear to be impartial is another factor relevant in evaluating those jurors' assurances of

14

impartiality."); *Haldeman*, 559 F.2d at 63 (observing that "if an impartial jury actually cannot be selected, that fact should become evident at the voir dire"). Instead, the judges presiding over nearly all of those trials were able to select a jury in one or two days. *See, e.g., United States v. Ryan Zink,* 21-cr-191, Minute Entries (Sept. 5, 2023); *United States v. Stephen Horn*, 21-cr-301 Minute Entries (Sept. 13, 2023); *United States v. Reed Christensen*, 21-cr-455, Minute Entries (Sept. 12 & 13, 2023); *United States v. Reffitt*, No. 21-cr-32, Minute Entries (Feb. 28 & Mar. 1, 2022); *United States v. Robertson*, No. 21-cr-34, Minute Entry (Apr. 5, 2022); *United States v. Thompson*, No. 21-cr-161, Minute Entry (Apr. 11, 2022); *United States v. Webster*, No. 21-cr-208, Minute Entry (Apr. 25, 2022); *United States v. Hale-Cusanelli*, No. 21-cr-37, Minute Entry (May 23, 2022); *United States v. Anthony Williams*, No. 21-cr-377, Minute Entry (June 27, 2022); *United States v. Bledsoe*, No. 21-cr-204, Minute Entry (July 18, 2022); *United States v. Herrera*, No. 21-cr-619, Minute Entry (D.D.C. August 15, 2022); *United States v. Jensen*, No. 21-cr-6, Minute Entries (Sep. 19 & 20, 2022); *United States v. Strand*, No. 21-85, Minute Entry (D.D.C. Sep. 20, 2022); *United States v. Alford*, No. 21-cr-263, Minute Entry (Sep. 29, 2022); *United States v. Riley Williams*, No. 21-cr-618, Minute Entries (D.D.C. Nov. 7 & 8, 2022); *United States v. Schwartz*, No. 21-cr-178, Minute Entries (D.D.C. Nov. 22 & 29, 2022); *United States v. Gillespie* No. 22-cr-60, Minute Entry (D.D.C. Dec. 19, 2022); *United States v. Barnett*, 21-cr-38, Minute Entries (D.D.C. Jan. 9 & 10, 2023); *United States v. Sheppard*, No. 21-cr-203, Minute Entries (D.D.C. Jan. 20 & 23, 2023); *United States v. Eckerman*, No. 21-CR-623, Minute Entry (D.D.C. Jan. 23, 2023); *United States v. Zink*, 21-cr-191, Minute Entry, (D.D.C. Sept. 5, 2023). The only exceptions have trials involving seditious conspiracy charges. *See United States v. Rhodes, et al.*, No. 22-cr-15, Minute Entries (Sept. 27, 28, 29; Dec. 6, 7, 8, 9, 2022). Moreover, juries in some January 6

trials have either been unable to reach a verdict on certain counts, *see United States v. Williams*, No. 21-cr-618; *United States v. Gillespie* (22-cr-60)*,* or have acquitted on some counts, *see United States v. Rhodes, et al.*, No. 22-cr-15, ECF No. 410 (D.D.C. Nov. 29, 2020) *United States v. Alexander Sheppard* (21-cr-203)*, United States v. Vitali Gossjankowski* (21-cr-123)*, United States v. Kenneth Thomas* (21-cr-552)*, United States v. Ralph Celentano* (22-cr-186). Of particular note, even the jury trying the leaders of the Proud Boys acquitted on certain counts—and deliberated for approximately 10 days. Minute Entry (May 4, 2023), *Nordean*, No. 21-cr-175.

Using the first five January 6-related jury trials as exemplars, moreover, the voir dire that took place undermines O'Kelly's claim that prejudice should be presumed. In *Reffitt*, the Court individually examined 56 prospective jurors and qualified 38 of them (about 68% of those examined). *See Reffitt*, No. 21-cr-32, ECF No. 136 at 121. The Court asked all the prospective jurors whether they had "an opinion about Mr. Reffitt's guilt or innocence in this case" and whether they had any "strong feelings or opinions" about the events of January 6 or any political beliefs that it would make it difficult to be a "fair and impartial" juror. *Reffitt*, No. 21-cr-32, ECF No. 133 at 23, 30. The Court then followed up during individual voir dire. Of the 18 jurors that were struck for cause, only nine (or 16% of the 56 people examined) indicated that they had such strong feelings about the events of January 6 that they could not serve as fair or impartial jurors.[3]

---

[3] For those struck based on a professed inability to be impartial, see *Reffitt*, No. 21-cr-32, ECF No. 133 at 49-54 (Juror 328), 61-68 (Juror 1541), 112-29 (Juror 1046); ECF No. 134 at 41-42 (Juror 443), 43-47 (Juror 45), 71-78 (Juror 1747), 93-104 (Juror 432), 132-43 (Juror 514); ECF No. 135 at 80-91 (Juror 1484). For those struck for other reasons, see *Reffitt*, No. 21-cr-32, ECF No. 134 at 35-41 (Juror 313, worked at Library of Congress); ECF No. 134 at 78-93 and ECF No. 135 at 3 (Juror 728, moved out of D.C.); ECF No. 135 at 6-8 (Juror 1650, over 70 and declined to serve), 62-73 (Juror 548, unavailability), 100-104 (Juror 715, anxiety and views on guns), 120 (Juror 548,

In *Thompson*, the Court individually examined 34 prospective jurors, and qualified 25 of them (or 73%). *See Thompson*, No. 21-cr-161, ECF No. 106 at 170, 172, 181, 190, 193. The court asked the entire venire 47 standard questions, and then followed up on their affirmative answers during individual voir dire. *Id.* at 4-5, 35. Of the nine prospective jurors struck for cause, only three (or about 9% of those examined) were stricken based on an inability to be impartial, as opposed to some other cause.[4]

Similarly, in *Robertson*, the Court individually examined 49 prospective jurors and qualified 34 of them (or about 69% of those examined). *See Robertson*, No. 21-cr-34, ECF No. 106 at 73. The Court asked all prospective jurors whether they had "such strong feelings" about the events of January 6 that it would be "difficult" to follow the court's instructions "and render a fair and impartial verdict." *Robertson*, No. 21-cr-34, ECF No. 104 at 14. It asked whether anything about the allegations in that case would prevent prospective jurors from "being neutral and fair" and whether their political views would affect their ability to be "fair and impartial." *Id.* at 13, 15. The Court followed up on affirmative answers to those questions during individual voir dire. Of the 15 prospective jurors struck for cause, only nine (or 18% of the 49 people examined) indicated that they had such strong feelings about the January 6 events that they could not be fair or

---

medical appointments); ECF No. 136 at 41-43 (Juror 1240, health hardship), 53-65 (Juror 464, worked at Library of Congress), 65-86 (Juror 1054, prior knowledge of facts).

[4] For the three stricken for bias, see *Thompson*, No. 21-cr-161, ECF No. 106 at 51-53 (Juror 1242), 85-86 (Juror 328), 158-59 (Juror 999). For the six stricken for hardship or inability to focus, see *Thompson*, No. 21-cr-161, ECF No. 106 at 44 (Juror 1513), 45 (Juror 1267), 49-50 (Juror 503), 50-51 (Juror 1290), 86-93 (Juror 229), 109-10 (Juror 1266).

17

impartial.[5]

In *Webster*, the Court individually examined 53 jurors and qualified 35 of them (or 66%), *Webster*, No. 21-cr-208, ECF No. 115 at 6, though it later excused one of those 35 based on hardship, *Webster*, No. 21-cr-208, ECF No. 114 at 217-18. The Court asked all prospective jurors whether they had "strong feelings" about the events of January 6 or about the former President that would "make it difficult for [the prospective juror] to serve as a fair and impartial juror in this case." *Webster*, No. 21-cr-208, ECF No. 113 at 19. During individual voir dire, the Court followed up on affirmative answers to clarify whether prospective jurors could set aside their feelings and decide the case fairly. *See, e.g., id.* at 32-33, 41-42, 54-56, 63, 65-66. Only 10 out of 53 prospective jurors (or about 19%) were stricken based on a professed or imputed inability to be impartial, as opposed to some other reason.[6] The *Webster* Court observed that this number "was actually relatively low" and therefore "doesn't bear out the concerns that were at root in the venue transfer motion" in that case. *Webster*, No. 21-cr-208, ECF No. 115 at 7.

---

[5] For those struck based on a professed inability to be impartial, see *Robertson*, No. 21-cr-34, ECF No. 104 at 26-34 (Juror 1431), 97-100 (Juror 1567); ECF No. 105 at 20-29 (Juror 936), 35-41 (Juror 799), 59-70 (Juror 696), 88-92 (Juror 429); ECF No. 106 at 27-36 (Juror 1010), 36-39 (Juror 585), 58-63 (Juror 1160). For those struck for other reasons, see *Robertson*, No. 21-cr-34, ECF No. 104 at 23-26 (Juror 1566, hardship related to care for elderly sisters), 83-84 (Juror 1027, moved out of D.C.); ECF No. 105 at 55-59 (Juror 1122, language concerns), 92-94 (Juror 505, work hardship); ECF No. 106 at 16-21 (Juror 474, work trip); 50-53 (Juror 846, preplanned trip).

[6] Nine of the 19 stricken jurors were excused based on hardship or a religious belief. *See Webster*, No. 21-cr-208, ECF No. 113 at 46 (Juror 1464), 49-50 (Juror 1132), 61 (Juror 1153), 68 (Juror 951), 78 (Juror 419); *Webster*, No. 21-cr-208, ECF No. 114 at 102-04, 207, 217 (Juror 571), 188 (Juror 1114), 191 (Juror 176), 203-04 (Juror 1262). Of the ten other stricken jurors, three professed an ability to be impartial but were nevertheless stricken based on a connection to the events or to the U.S. Attorney's Office. *See Webster*, No. 21-cr-208, ECF No. 113 at 58-60 (Juror 689 was a deputy chief of staff for a member of congress); *Webster*, No. 21-cr-208, ECF No. 114 at 139-41 (Juror 625's former mother-in-law was a member of congress); 196-98 (Juror 780 was a former Assistant U.S. Attorney in D.C.).

In *Hale-Cusanelli*, the Court individually examined 47 prospective jurors and qualified 32 of them (or 68%). *Hale-Cusanelli*, No. 21-cr-37, ECF No. 91 at 106, 111. The Court asked prospective jurors questions similar to those asked in the other trials. *See Hale-Cusanelli*, No. 21-cr-37, ECF No. 90 at 72-74 (Questions 16, 20). Of the 15 prospective jurors struck for cause, 11 (or 23% of those examined) were stricken based on a connection to the events of January 6 or a professed inability to be impartial.[7]

In these first five jury trials, the percentage of prospective jurors stricken for cause based on partiality is far lower than in *Irvin*, where the Supreme Court said that "statement[s] of impartiality" by some prospective jurors could be given "little weight" based on the number of other prospective jurors who "admitted prejudice." *Irvin*, 366 U.S. at 728. In *Irvin*, 268 of 430 prospective jurors (or 62%) were stricken for cause based on "fixed opinions as to the guilt of petitioner." *Id.* at 727. The percentage of partiality-based strikes in these first five January 6-related jury trials—between 9% and 23% of those examined—is far lower than the 62% in *Irvin*. The percentage in these cases is lower even than in *Murphy*, where 20 of 78 prospective jurors (25%) were "excused because they indicated an opinion as to petitioner's guilt." *Murphy*, 421 U.S. at 803. *Murphy* said that this percentage "by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own." *Id.* As in *Murphy*, the number of prospective jurors indicating bias does not call into

---

[7] *See Hale-Cusanelli*, No. 21-cr-37, ECF No. 90 at 61-62 (Juror 499), 67-68 (Juror 872), 84-85 (Juror 206), 91-94 (Juror 653); ECF No. 91 at 2-5 (Juror 1129), 32 (Juror 182), 36 (Juror 176), 61-62 (Juror 890), 75-78 (Juror 870), 94-97 (Juror 1111), 97-104 (Juror 1412). For the four jurors excused for hardship, see *Hale-Cusanelli*, No. 21-cr-37, ECF No. 90 at 77-79 (Juror 1524), 99 (Juror 1094); ECF No. 91 at 12 (Juror 1014), 31 (Juror 899).

question the qualifications of others whose statements of impartiality the Court has credited.

Far from showing that "an impartial jury actually cannot be selected," *Haldeman*, 559 F.2d at 63, the first five January 6-related jury trials confirmed that voir dire can adequately screen out prospective jurors who cannot be fair and impartial, while leaving more than sufficient qualified jurors to hear the case. The Court should deny O'Kelly request for a venue transfer and should instead rely on a thorough voir dire to protect the defendant's right to an impartial jury.

## CONCLUSION

For all these reasons, O'Kelly's motion to transfer venue should be denied.

Respectfully submitted,

Matthew M. Graves
United States Attorney
D.C. Bar No. 481052

By: */s/ Nathaniel K. Whitesel*
NATHANIEL K. WHITESEL
Assistant United States Attorney
DC Bar No. 1601102
601 D Street NW
Washington, DC 20530
Nathaniel.Whitesel@usdoj.gov
(202) 252-7759